# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ALEX Z. SIMMONS,**
          **Plaintiff,**

     **v.**                                        **Case No. 05-C-1050**

**JO ANNE BARNHART,**
**Commissioner of the Social Security Administration,**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Alex Simmons applied for social security disability benefits, alleging that he was unable to work due to back pain, and mental and vision problems.  The Social Security Administration ("SSA") denied his claim administratively, as did an Administrative Law Judge ("ALJ") following a hearing.  The Appeals Council then denied plaintiff's request for review, making the ALJ's decision the final decision of the SSA.  Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2004).  Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## I.  APPLICABLE LEGAL STANDARDS

### A.    Disability Standard

In order to obtain benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The SSA has adopted a sequential five-step test for determining whether

a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments;[1] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[2] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[3] and (5) if not, whether the claimant is able to perform any other work in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled. A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant carries the burden at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).

## B. Standard of Review of ALJ's Decision

Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review of is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).

---

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[2]These impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. ,"the Listings").

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

2

Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion.  Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).  A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ.  Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings.  Id.; Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings.  See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).  Nevertheless, any legal errors must be harmful to warrant reversal and remand. Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

## II.  FACTS AND BACKGROUND

### A.     Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on June 27, 2003, alleging a disability onset date of March 10, 2001.[4]  (Tr. at 18, 49, 109, 189.)  In a disability report completed by a field office interviewer, plaintiff reported that he was unable to work due to a degenerative disc in the

_____

[4]Plaintiff had filed a previous claim for benefits alleging an onset date of March 10, 2001, which was denied by an ALJ on August 28, 2002.  (Tr. at 40-41; 114.)

3

lower back, depression, eye problems and memory problems. (Tr. at 109.) He stated that he was often tired, felt pain, could not walk any distance or stand for over 15 minutes, and could not lift over 20 pounds. (Tr. at 109.) He related that he worked in the past as a busser/supply clerk in a restaurant from 1989 to1990, as a machine operator in a factory from 2000 to 2001, and as a quality control inspector in a factory from 1991 to 1998. (Tr. at 109.) In the final job, he indicated that he was on his feet five out of eight hours, and lifted up to 50 pounds. (Tr. at 110.) He reported that he had completed the 12th grade in school and had no additional vocational training. (Tr. at 112.) The officer who completed the report noted that plaintiff appeared to have no physical, communicative or mental difficulties. (Tr. at 115.)

In a pain questionnaire completed on July 10, 2003 with the assistance of his aunt, plaintiff wrote that he experienced intense pain every day, all day, all over his body. He stated that the pain prevented him from bending, squatting, stooping, reaching, standing or sitting, and that he took over the counter medication for relief, which helped a little. He also listed three prescription medications he was taking and denied any side effects. He wrote that he used a cane on the advice of his doctor. (Tr. at 84, 86.) He stated that he never paid bills, used a checkbook, completed a money order or counted change due to memory problems. He also denied doing any of the daily activities listed on the form (e.g., laundry, dishes, cleaning, home/car maintenance) due to hand pain and cramps, and an inability to lift. (Tr. at 87.) He wrote that his family shopped and cooked for him, but he was able to groom himself, though it took him longer. He stated that he spent his time watching television and that memory loss prevented him from reading, and hand pain prevented him from driving. (Tr. at 88-89.) He stated that he was able to get along with others. (Tr. at 90.)

4

In a work history report also completed with the assistance of his aunt on July 10, 2003, plaintiff wrote that he worked as a trainer at J.C. Penny from 2001-2002, as a factory worker from 1998-2000, as an inspector from 1996-1998, for a restaurant from 1995-1996, on an assembly line from 1993-1994, and as a bus boy from 1991-1993.  (Tr. at 91.) Plaintiff described these jobs as requiring him to be on his feet six out of eight hours, and to lift less than 10 pounds.  (Tr. at 92-97.)

In a third party report, plaintiff's aunt indicated that he mostly sat and watched TV. (Tr. at 99, 103.)  She wrote that he was able to care for himself but did so slowly because of hand pain and needed reminders due to memory problems.  (Tr. at 100-01.)  She wrote that family members cooked and shopped for plaintiff, and he did no house or yard work. (Tr. at 101-02.)  In the section of the form concerning plaintiff's abilities (e.g, lifting, standing, walking, using hands, understanding, completing tasks, following instructions), she circled every activity but one (stair-climbing) and wrote that he could not do anything because of cramps and pain.  (Tr. at 104.)[5]  She wrote that he could walk for about 10 minutes before he had to rest for two hours, that he could pay attention for about 30 minutes, and that he was unable to follow instructions.  (Tr. at 104.)  She stated that he handled stress and changes in routine poorly because he did not understand.  (Tr. at 105.)

As noted, the SSA administratively denied the claim.  (Tr. at 35, 182, 187.)

---

[5]She even circled "getting along with others" (Tr. at 104) despite stating on the previous page of the form that plaintiff was a nice person and "gets along with everyone" (Tr. at 103) and on the bottom of the page that plaintiff "get[s] along well with authority figures and everyone else" (Tr. at 104).

5

**B.      The Hearing**

Plaintiff requested a hearing (Tr. at 34, 55, 179), and on December 1, 2004, he appeared with counsel before ALJ James Seiler.  (Tr. at 24, 174, 198.)  Plaintiff was the only witness.[6]

Plaintiff testified that his date of birth was July 3, 1958, and that he had graduated from high school and completed paralegal courses at a community college.  He stated that he had worked in a confectionary, an antique shop, and as an auto mechanic.  (Tr. at 201-02.)  Plaintiff testified that he applied for disability due to back pain, numbness and pain in his left leg, pain in his hands, dizziness, headaches, and chest pain.  He stated that he was in pain all day.  (Tr. at 202-03.)

Plaintiff testified that his last job was at Gemini, a printer, in 2001 and 2002.  He stated that he was fired because of his poor production, which was caused by dizziness and blurriness, and the fact that he had to get up every 15 minutes and walk around.  (Tr. at 203.)

Plaintiff testified that his back pain started in 1996 after a work injury, and he was diagnosed with a degenerated lumbar disc.  He stated that he continued to experience pain in his back.  (Tr. at 203-04.)  He said that he saw a Dr. Lee for his back injury, who restricted him from lifting over 20 pounds and twisting repetitively.  (Tr. at 205.)  Prior to the injury, plaintiff stated that he worked as a quality control inspector, which required him to lift boxes and inspect parts, and that he was no longer able to do that job because of the 20 pound

---

[6]At the time of the hearing, plaintiff lived in St. Louis, and the hearing took place in Creve Coeur, Missouri.  (Tr. at 8, 198.)  He moved to Milwaukee while the case was before the Appeals Council.  (See Tr. at 2.)

6

lifting restriction.  He also stated that he could no longer work as a busboy because that job also required him to lift over 20 pounds.  (Tr. at 206.)

Plaintiff testified that he was seeing a psychiatrist, who provided medications.  (Tr. at 207.)  He also testified to receiving medications for his physical problems from Grace Hill Clinic.  (Tr. at 207.)  He stated that his current physicians had not restricted his employment because they knew he was not working.  (Tr. at 208.)  He stated that a recent examination also revealed an abnormality with his heart.  (Tr. at 209.)

Plaintiff testified that on a typical day he went to bed around 8:00 p.m., got up around 9:00 a.m., washed up, then laid back down.  He stated that he did not eat breakfast and sometimes ate lunch, which was prepared by his wife before she went to work.  (Tr. at 208, 211.)  He did no shopping because he could not stand long enough.  He testified that he watched television, did not read, and engaged in no other activities.  (Tr. at 209.)  He stated that he went out of the house about twice per week.  (Tr at 213.)  He said that when he was examined by the SSA consulting doctor he was in too much pain to do the exercises.  (Tr. at 210.)  He stated that he could walk about a block, and did no lifting, yard work or laundry. (Tr. at 214.)

**C.    Medical/Documentary Evidence**

On November 13, 2001, plaintiff was seen at Barnes Jewish Hospital complaining of dizziness.  (Tr. at 117.)  He also reported a "numb/tingely feeling alternating between R/L side – he associate[d] with a 'disc' problem."  (Tr. at 118.)  He was noted to have possible degenerative disc disease, provided "emotional support," and apparently discharged.  (Tr. at 118.)

7

On August 14, 2003, after he filed his application for benefits, plaintiff was evaluated by Dr. Elbert Cason at the behest of the SSA. Dr. Cason had plaintiff perform various range of motion exercises, and he noted that plaintiff put forth a poor effort and was very resistant. (Tr. at 121-23.) Plaintiff's chief complains were lower back pain and eye problems. Plaintiff attributed the back pain to a work injury and stated that he had physical therapy and was told not to lift more than 20 pounds. He reported taking Tylenol 3 for the pain. He stated that the pain went down his left leg to his foot, and he used a cane in his right hand, which was not prescribed. Plaintiff stated that he could walk three blocks, did no housework and rarely went out. He told Dr. Cason that he usually watched TV, laid down or sat on the porch when weather permitted. He further stated that sometimes his vision was blurry. However, on examination plaintiff's corrected vision was 20/30 on the right and 20/25 on the left. (Tr. at 127.) On examination of his back, Dr. Cason noted that plaintiff "was resistant to all motions of his back." (Tr. at 126.) Dr. Cason also noted that "when I touched the skin of his back in the lumbar area he would jump which is grossly exaggerated." (Tr. at 126.) On musculoskeletal exam, Dr. Cason noted:

> This gentleman made an extremely poor effort and was very resistant to performing any of the musculoskeletal tests. A complete range of motion chart has been filled out. When he stands he stands on his right foot, his left foot out approximately a foot from his normal position or stance. He has a cane which he says is not doctor prescribed and he carries that in his right hand. However, during the exam, I did not have him use the cane. His gait is with a marked limp on the left leg; he barely puts any weight on the left leg. He is very resistan[t] to ankle motions, knee motions, hip motions and back motions . . . . His grip strengths were 4/5 bilateral. The hands could be fully extended however, the fists could be made and the fingers could be opposed. The remainder of the musculoskeletal examination was unremarkable.

(Tr. at 125-26.)

Case 2:05-cv-01050-LA   Filed 03/03/06   Page 8 of 34   Document 18

On neurological examination, Dr. Cason found no evidence of swelling or inflammation of any joint, but plaintiff jumped when the doctor touched any joint, which the doctor found "grossly exaggerated." (Tr. at 125.) Plaintiff could use his fingers for buttoning, writing, and using small tools or parts. Dr. Cason found no evidence of neurological abnormality. (Tr. at 125.)

In a psychological exam completed for the SSA on the same date, Tom Devant Johns, Ph.D., noted that "it was difficult to get a straight answer of any kind out of the claimant. He initially told me he was last working in 1991. He then revised that to 1996 or 1998 and then, he indicated he also worked in 2000 and 2001." (Tr. at 132.) Dr. Johns opined that plaintiff "tended to exaggerate his physical, as well as psychological symptoms and occasionally presented conflicting information. Overall, I would consider him a fair minus historian." (Tr. at 132.)

Plaintiff told Dr. Johns that he suffered from depression since he hurt his back in 1996. However, he denied any treatment or use of psychotropic medication. (Tr. at 132.) Dr. Johns found that plaintiff tended to exaggerate his symptoms, as plaintiff rated the current severity of his depression at 9/10, which was well in excess of his presentation. Plaintiff endorsed most signs of depression and noted some unusual, if not bizarre, problems with memory. (Tr. at 131.) Dr. Johns found plaintiff to be alert, with adequate eye contact, and with normal posture and gait. (Tr. at 130.) He was spontaneous, coherent and logical. (Tr. at 130.) He was completely oriented, and his practical judgment, knowledge and social judgment were intact. Plaintiff described his daily activities as quite limited – watching TV, sitting on the porch and laying down. (Tr. at 129.) Dr. Johns opined that plaintiff would be able to complete simple tasks in a timely manner over a sustained period

9

of time. His diagnoses were: adjustment disorder with depressed mood, currently mild to moderate without treatment; personality disorder, not otherwise specified; with a GAF of 61.[7] (Tr. at 128.)

On August 15, 2003, plaintiff saw Dr. Emmanuel Venkatesan at Grace Hill Health Center, complaining of headaches, back pain, arthritis in the fingers and depression. He was noted to have "some psychotic features" (Tr. at 137; 147) and reported hearing voices saying "[illegible] is gonna get you." (Tr. at 159). Dr. Venkatesan noted that plaintiff appeared depressed, that his spine was tender, and that his pain increased on leg raising. (Tr. at 138; 148.) He was apparently provided medication for his back pain and depression. (Tr. at 137.) Plaintiff returned on August 22, continuing to complain of back and leg pain. He also reported hearing voices. The note indicated that plaintiff's pain was better, "but today he is floridly psychotic and has suicidal thoughts." (Tr. at 141; 155.) His wife indicated that he had been "wandering the streets." (Tr. at 141; 155.) He was referred to the Metropolitan St. Louis Psychiatric Center (MPC), his wife drove him there, and he was apparently admitted. (Tr. at 141; 155.) There are no records pertaining to plaintiff's treatment during this admission other than notes from August 27, 2003, indicating that he was prescribed Paxil and Amitriptyline. (Tr. at 135-36.)

On September 9, 2003, plaintiff was evaluated for the SSA by Dr. W. Bruce Donnelly. Dr. Donnelly noted that plaintiff's symptoms were "grossly exaggerated" when his back was touched. (Tr. at 57.) He found no evidence of any neurological abnormality, no swelling or

---

[7]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, scores between 61 and 70 reflect mild symptoms, with some difficulty in social and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

Case 2:05-cv-01050-LA   Filed 03/03/06   Page 10 of 34   Document 18

inflammation of any joint, no sensory, motor or reflex abnormality, and no muscle spasm. (Tr. at 57.)

On September 8, 2003, Rocco Cottone, Ph.D., completed a Pyschiatric Review Technique form for the SSA. He evaluated plaintiff under Listings 12.04 (Affective Disorders), 12.07 (Somatoform Disorders) and 12.08 (Personality Disorders).[8] (Tr. at 62.) Under the A criteria of 12.04 he noted evidence of an adjustment disorder (Tr. at 65), under 12.07 evidence of a pain disorder (Tr. at 68), and under 12.08 evidence of a personality disorder, not otherwise specified (Tr. 69). Under the B criteria, he found that plaintiff had mild limitations of activities of daily living, and moderate limitations in maintaining social functioning and in maintaining concentration, persistence and pace. He found no episodes of decompensation. (Tr. at 72.) In his notes, Dr. Cottone wrote: "credibility is questionable, and partial at best." (Tr. at 74.)

In a mental RFC assessment completed on the same date, Dr. Cottone found that plaintiff was markedly limited in his ability to understand, remember and carry out detailed instructions, but was not significantly or only moderately limited in the other categories listed on the form. (Tr. at 58-59.) He concluded that plaintiff was able to understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately

---

[8]The Listings of mental impairments consist of three sets of "criteria": the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. If a claimant satisfies the A and B, or A and C criteria, he will be considered disabled. Mason v. Barnhart, 325 F. Supp. 2d 885, 888 (E.D. Wis. 2004).

11

to co-workers and supervisors; and adjust adequately to changes in work routine and setting.  He opined that plaintiff should avoid intense or extensive interpersonal interaction with co-workers, and public contact handling complaints or dissatisfied customers.  (Tr. at 60.)

On March 24, 2004, plaintiff returned to Dr. Vankatesan, who noted that plaintiff had been admitted to the MPC for five days in August 2003 and was provided Paxil, but had "hardly any meds since then" and felt his depression returning.  Plaintiff stated that his back pain was problematic again, but that he did well while he had Motrin and Flexeril.   He was provided medication for his back pain and depression.  (Tr. at 163.)

On November 18, 2004, plaintiff saw Dr. Katazyna Krawczyk, who diagnosed him with psychosis, NOS, and prescribed several medications.  (Tr. at 167-68.)  Plaintiff returned to Dr. Venkatesan on December 1, 2004, complaining of back and chest pain.  (Tr. at 164.) He was referred to Dr. Krawczyk, who increased his medications on December 7, 2004. (Tr. at 166.)[9]

On December 22, 2004, Dr. Venkatesan completed a report in which he indicated that plaintiff suffered from paranoid schizophrenia and chronic back pain, which caused severe impairment in mobility and thought processes.  He wrote: "unable to hold a job > 3y."  (Tr. at 171.)

Dr. Venkatesan continued to prescribe Trazodone and Celebrex, and Dr. Krawczyk Risperdal, Trazodone and Effexor in January, February and March 2005.  (Tr. at 192-94.) During the hearing, plaintiff submitted prescription receipts for Ibuprofen 800, Paroxetine,

_____

[9]The notes from Drs. Krawczyk and Venkatesan are handwritten and very difficult to read.

12

Cyclobenzaprine and Amitriptyline, which were filled on March 24, 2004, and Effexor, Trazodone and Risperdal, which were filled on November 19, 2004. (Tr. at 52-54.)

**D.      ALJ's Decision**

On February 25, 2005, the ALJ issued an unfavorable decision. (Tr. at 8.) The ALJ first noted that plaintiff had filed a previous application for benefits on May 31, 2001, which was denied by an ALJ on August 28, 2002. The ALJ applied res judicata to the period ending with the prior determination, which was final and based on the same facts as the present application. (Tr. at 11.)

The ALJ then evaluated the instant application under the five-step process. The ALJ found that plaintiff had not been employed since his alleged onset date of March 10, 2001, and that he suffered from severe impairments – back strain, adjustment disorder with depressed mood, pain disorder, and personality disorder – but that none met or equaled a listed impairment. He then found that plaintiff retained the RFC for light work (i.e. lifting no more than 20 pounds) with no contact with the general public. Despite his mental impairments, the ALJ found that plaintiff could understand, remember and carry out simple instructions, make simple work-related decisions, and respond appropriately to supervision, co-workers and usual work situations. He concluded that plaintiff's allegations of additional, disabling symptoms were not credible. Based on this RFC, the ALJ concluded that plaintiff could perform his past work in a factory. (Tr. at 16-17.)

Plaintiff sought review (Tr. at 195-96), but the Appeals Council denied his request on August 24, 2005. (Tr. at 2.) This action followed.

13

### III. DISCUSSION

Plaintiff argues that (1) the ALJ based his finding of res judicata on an incomplete record; (2) the ALJ's step four determination was improper; (3) the ALJ did not properly consider his treating source statements; (4) the ALJ did not properly consider the report of state agency consultant Dr. Cottone; (5) the decision was based on the ALJ's speculation; (6) the ALJ misunderstood the impact of plaintiff's somatoform disorder; and (7) the ALJ's assessment of the listings and RFC was not supported by substantial evidence and was contrary to law.

### A.    Res Judicata

The ALJ found that res judicata applied to the August 28, 2002 decision denying plaintiff's previous application for benefits. (Tr. at 11.) However, plaintiff notes that the ALJ made this ruling without obtaining the record of that prior application. He contends that this violated the HALLEX,[10] which provides in pertinent part:

> The ALJ must admit any prior hearing records into the record of the current case if they are relevant to the current case or are mentioned at the current hearing. The ALJ must admit any prior records that are mentioned in the current hearing decision. If the ALJ decides not to obtain and admit such prior records into the record of the current case (e.g., the ALJ decides they are not relevant to the current case), he or she must explain at the hearing and in the decision why they are not being admitted.

HALLEX I-2-6-58 A.

Plaintiff concedes that the Seventh Circuit has never held that failure to follow the HALLEX is reversible error, and the two circuits which have addressed the issue are split.

_____

[10]The HALLEX is a manual prepared by the Associate Commissioner of Hearings and Appeals to provide guidance to the SSA's Office of Hearings and Appeals. See http://www.ssa.gov/OP_Home/hallex (last visited Feb. 28, 2006).

14

See Cloute v. Barnhart, No. 03-C-0737, 2004 U.S. Dist. LEXIS 21423, at *25 (W.D. Wis. June 25, 2004), adopted by, 2004 U.S. Dist. LEXIS 13922 (W.D. Wis. July 19, 2004) (citing Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (holding that HALLEX does not have legal force); Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000) (holding that failure of agency to follow its own procedures is reversible error where that failure results in prejudice)). Plaintiff asks me to treat a violation of the HALLEX like a violation of the Commissioner's regulations and rulings, which does constitute legal error. Brown v. Barnhart, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2003) (citing Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991)).

The Commissioner argues that I lack subject matter jurisdiction to consider this argument because the ALJ's "decision to apply administrative res judicata is a discretionary one not subject to judicial review." Johnson v. Sullivan, 936 F.2d 974, 976 (7th Cir. 1991); see also Califano v. Sanders, 430 U.S. 99, 107-08 (1977) (holding that § 405(g) does not grant district courts authority to review the SSA's refusal to reopen a previous claim for benefits). Johnson and Califano relied on the fact that § 405(g) allows judicial review only of "final" decisions "made after a hearing." Johnson. 936 F.2d at 975 (citing Califano, 430 U.S. at 108). In those cases, the claimant's second application had been denied on the basis of res judicata, without a hearing. In the present case, conversely, I have before me a "final decision" rendered after a hearing; the ALJ did not dismiss the instant application on res judicata grounds. Further, the Seventh Circuit has noted that jurisdiction is present when the second claim is not the same as the first for res judicata purposes. Johnson, 936 F.2d at 975 (citing McGowen v. Harris, 666 F.2d 60, 65 (4th Cir. 1981)). The district court also has jurisdiction to determine whether, in the event of a dispute, the claims are the same, or whether, even if they are and res judicata might have applied, the ALJ nevertheless

15

reopened the prior claim.  McGowen, 666 F.2d at 66.  In the present case, plaintiff questions whether the claims are the same, and, as noted, the ALJ decided the second application on the merits.  Therefore, I have jurisdiction.

Nevertheless, plaintiff's claim fails.  Even if a violation of the HALLEX could be noticed by the district court, plaintiff has failed to demonstrate reversible error.  Those courts which have held that failure to follow the HALLEX is error require that the failure be prejudicial.  Newton, 209 F.3d at 459.  This is consistent with the Seventh Circuit's position on failure to follow the applicable regulations.   Keys, 347 F.3d at 994-95.  In the present case, plaintiff has failed to show that the ALJ's failure to obtain the record from his previous application resulted in prejudice.  For instance, he does not contend that his condition was markedly different prior to August 28, 2002, or that anything in the file of that prior application would reasonably have affected the ALJ's decision on the instant application.  Plaintiff alleges that he was harmed by a due process violation in that he was not given a chance to contest the evidence upon which the ALJ relied and by receipt of a decision based on a guess rather than evidence.  But this argument confuses error with prejudice.  It is true that ALJs must follow applicable constitutional, statutory and regulatory norms, but their failure to do so does not result in automatic reversal.  Plaintiff must show how the ALJ's failure to follow the law affected the outcome.

Plaintiff also argues that the ALJ failed to fully and fairly develop the record by obtaining the record of the previous case.  See Thompson v. Sullivan, 933 F.2d 581, 585 (7th Cir. 1991) ("A well-settled proposition regarding social security disability hearings is that it is a basic obligation of the ALJ to develop a full and fair record.") (internal quote marks omitted).  However, the Seventh Circuit has held that "a significant omission" is usually

16

required before the court will find that the ALJ failed to develop the record.  Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994).  "In other words, the omission must be prejudicial."  Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997); see also Cannon, 213 F.3d at 978 ("Gloria has failed to identify any evidence that was not obtained or how a lack of evidence prejudiced her."); Binion v. Shalala, 13 F.3d 243, 246 (7th Cir. 1994) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant remand.").  As noted, plaintiff has failed to show how he was prejudiced by the ALJ's failure to supplement the record.

Finally, plaintiff notes that the ALJ's decision must be based on substantial evidence rather than a hunch, and argues that without the record of the prior case the ALJ could not properly apply res judicata or find that the prior application was based on the same facts.  However, the record contains several references to the prior application in addition to the DIB Review Sheet (Tr. at 40-41; 114), and the record supports the ALJ's finding that both applications were based on the same facts.[11]  In any event, the ALJ found that plaintiff was not disabled at any time after his alleged onset date of March 10, 2001 (Tr. at 16-17), thus the finding of res judicata had no real effect on the outcome.

Therefore, for all of these reasons, plaintiff's first claim of error fails.

---

[11]Plaintiff alleged the same onset date in both, and his testimony made clear that he suffered from the same maladies during the time period covered by both applications.  (See Tr. at 203-04, where plaintiff testified that he hurt his back in 1996 and had pain continuously since then, and Tr. at 132, where plaintiff told Dr. Johns that he had been depressed since his back injury in 1996.)

17

**B.**     **Step Four Determination**

Plaintiff's second argument is that the ALJ erred in finding at step four that he could return to his past factory work. The step four analysis consists of three steps. SSR 82-62; Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005). First, the ALJ must determine the claimant's RFC. Second, he must determine the physical and mental demands of the claimant's past work. In this context, past work can mean the actual functional demands of the particular job that the claimant performed, or the functional demands and duties of the job as it is generally found in the national economy. Finally, the ALJ must determine whether the claimant has the ability to meet the job demands found at step two despite the mental or physical limitations found at step one. Blom, 363 F. Supp. 2d at 1057. At the final step, the ALJ cannot simply describe a claimant's past job in a generic way, e.g. "sedentary" or "light," and "conclude, on the basis of the claimant's residual capacity, that [he] can return to [his] previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991) (citing Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984)).

In the present case, plaintiff raises four issues with the ALJ's determination. First, he notes that the record contains contradictory information on his past work. In his decision, the ALJ cited plaintiff's work history report completed on July 10, 2003, apparently with the assistance of his aunt. (Tr. at 16; 91-98.) In that report, plaintiff indicated that his

18

factory jobs fell in the light exertional category.[12]  (See Tr. at 93-94.)  However, in the report completed by the field office interviewer on June 27, 2003 (Tr. at 116), plaintiff indicated that the factory job he held the longest was medium work[13] (see Tr. at 110).   At the hearing, plaintiff appeared to contradict these reports, both as to the time he spent working these jobs (Tr. at 203) and the amount of weight he had to lift to do them (Tr. at 206).  Plaintiff contends that the ALJ was obliged to resolve the conflict between the various statements about his past work.

However, as the Commissioner notes, the inconsistencies in the record were created by plaintiff's failure to provide straight answers, which cropped up throughout this case. (See Tr. at 132.)  Plaintiff, who was represented by counsel at the administrative level, carried the burden of proving at step four that he could not perform his past work.  See Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").  In the absence of such a demonstration, the ALJ was permitted to rely on the detailed work history report plaintiff submitted.  See, e.g., Murphy v. Barnhart, No. 01-C-50158, 2003 U.S. Dist. LEXIS 1264, at *36-42 (N.D. Ill. Jan. 27, 2003) (holding that ALJ's decision at step four was supported by substantial evidence, despite plaintiff's contradictory statements as to what he did, where ALJ relied on plaintiff's original application); Dodds v. Commissioner of Social

––––––––––––––––––––

[12]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, and standing and walking most of the day. 20 C.F.R. § 404.1567(b); Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999).

[13]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).

Case 2:05-cv-01050-LA   Filed 03/03/06   Page 19 of 34   Document 18

Security, No. 01-CV-72190, 2002 U.S. Dist. LEXIS 16932, at *19 (E.D. Mich. June 4, 2002), adopted by, 2002 U.S. Dist. LEXIS 14901 (E.D. Mich. June 30, 2002) (holding that ALJ did not err in relying on claimant's work history report, despite her later provision of contradictory information).

Second, plaintiff argues that the ALJ failed to make reasonable efforts to secure evidence about his past employment. He notes that the hearing was only 24 minutes long, a vocational expert ("VE") did not testify, and the ALJ did not ask plaintiff's lawyer to obtain vocational information. While a short hearing may be indicative of an ALJ's failure to fully develop the record, cf. Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988), the law does not require that hearings last a certain length of time. Plaintiff points to no specific failure of the ALJ, and again, plaintiff was represented by counsel, who could have asked any questions and presented any evidence he wished. Social security hearings are non-adversarial, but the ALJ need not act as the claimant's advocate. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004) (stating that although ALJ has duty to develop record, primary responsibility rests with claimant); Musgrave v. Sullivan, 966 F.2d 1371, 1377 (10th Cir. 1992) (stating that ALJ must fully develop record but is not claimant's lawyer). Further, SSR 82-62 provides: "The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work." Finally, the ALJ was not required to call a VE at step four; VE testimony is potentially required only at step five. E.g., Glenn v. Shalala, 21 F.3d 983, 988 (10th Cir. 1994) ("Only after a determination that claimant suffers from an impairment or combination of impairments severe enough to preclude her from returning to her prior work activity is the ALJ under obligation to make an inquiry to

20

determine what other employment is available to the claimant in the national economy. Due to the ALJ's determination that claimant could return to her former work activities, he was under no obligation to seek additional information from a vocational expert.") (internal citations omitted); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) ("The testimony of a vocational expert is only required to determine whether the claimant's residual functional capacity permits him to do other work after the claimant has met his initial burden of showing that he cannot do past work.").

Third, plaintiff argues that the questionnaires relied upon by the ALJ did not include all of the information necessary to match the past jobs to the RFC. Specifically, he notes that the forms do not discuss contact with the general public, from which the ALJ restricted plaintiff in the RFC determination. However, the forms contain nothing to indicate that the past work, in fact, required contact with the public. Plaintiff described one job as "assembly line work" (Tr. at 93) and the other as inspection work – "check[ing] out seals & products" (Tr. at 94). Similarly, there is nothing on the forms suggesting that the work required mental abilities greater than that needed for unskilled work. Again, it was plaintiff's burden to prove at step four that he could not mentally perform his past work, and nothing on these forms (or the other evidence pertaining to past work) suggests that he could not.

Fourth, plaintiff argues that the ALJ failed to provide a list of the specific requirements of the past job, as required by Nolen/Strittmatter. However, the forms cited by the ALJ included a specific list of job requirements. Plaintiff cites no authority for the proposition that the ALJ cannot incorporate a list by reference, and I cannot conclude that the ALJ erred by

21

failing to repeat all of these requirements in the decision.[14]  See <u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir. 2000) (stating that court must give the ALJ's opinion a commonsensical reading rather than nitpicking at it).

In sum, plaintiff has failed to show that the ALJ committed reversible error at step four.

## C.  Treating Source

Next, plaintiff argues that the ALJ failed to properly account for the opinion of his treating physician, Dr. Venkatesan.  Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to special consideration in social security cases.  <u>Dominguese v. Massanari</u>, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).  If the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence the ALJ must afford it "controlling weight."  20 C.F.R. § 404.1527(d)(2).  If the ALJ finds that the treating source's opinion does not meet this standard, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors."  20 C.F.R. § 404.1527(d); <u>see also</u> SSR 96-2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, he must always "give good reasons" for his decision.  20 C.F.R. § 404.1527(d)(2).

--------------------------------------------------

[14]Plaintiff speculates that these jobs were not substantial gainful activity. However, he makes no showing of that, and it appears from the exhibit the ALJ relied upon that plaintiff worked these jobs for several years each.

Plaintiff argues that the ALJ failed to properly consider Dr. Venkatesan's form report dated December 22, 2004, in which the doctor wrote that plaintiff had a "severe impairment of mobility due to pain" and a "severe impairment of thought processes due to schizophrenia." (Tr. at 171.) He further wrote that plaintiff had been "unable to hold a job > 3y." (Tr. at 171.)

The argument fails. Dr. Venkatesan did not impose any specific restrictions; he merely noted severe impairments in mobility and through processes. The ALJ found that plaintiff suffered from severe mental and physical impairments, and plaintiff fails to explain how Dr. Venkatesan's findings materially vary from the RFC found by the ALJ. I note further than Dr. Venkatesan did not check the box on the form indicating that plaintiff had a disability which prevented him from working. His nebulous statement that plaintiff was "unable to hold a job" does not necessarily support plaintiff's claim that he was prevented from working due to his impairments. Indeed, at the hearing, plaintiff testified that his doctors had not placed any kind of restrictions on his employment. He said: "They know I'm not employed, so they don't even – they asked me was I working and I told them no, I wasn't working. And they told me don't worry about it." (Tr. at 208.) Finally, even if the doctor did through this statement intend to offer an opinion on disability, this was an issue reserved to the Commissioner, and a doctor's opinion on it is not entitled to special deference. See 20 C.F.R. § 404.1527(e)(3). The ALJ is not required to award benefits just because a claimant's doctor says he cannot work. See Hofslien v. Barnhart, No. 05-2649, 2006 U.S. App. LEXIS 5125, at *5 (7th Cir. Mar. 1, 2005) (noting that a treating doctor may bend over backwards to help a patient get disability benefits); Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001) (stating that "a claimant is not entitled to disability benefits simply because

23

her physician states that she is 'disabled' or unable to work"); Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1984) ("The patients' regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

Plaintiff also contends that the ALJ improperly ignored Dr. Venkatesan's observations in the treatment notes that plaintiff was "floridly psychotic," had back spasm and increase of pain with straight leg raising, and was admitted to a psychiatric hospital. However, the ALJ did discuss Dr. Venkatesan's treatment notes (Tr. at 13) and although he did not mention all of these details, he was not required to do so.[15]  See Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005) (stating that the ALJ need not provide a complete written evaluation of every piece of testimony and evidence).  And, standing against these observations were those made by Drs. Johns and Krawczyk that plaintiff's psychiatric symptoms were mild to moderate.  The ALJ further noted that the evidence showed that such symptoms would not even be moderate if he took his medication.  (Tr. at 13.) Likewise, as the ALJ also noted, plaintiff reported that his back pain was controlled when he took his medication, and the examinations performed by the consultants revealed little wrong with plaintiff's back.  (Tr. at 12-13.)

Therefore, plaintiff's third claim of error fails.[16]

_____

[15]The ALJ did mention plaintiff's admission to the psychiatric hospital.  (Tr. at 13.)

[16]The Commissioner questions whether Dr. Venkatesan was a treating source, based on his limited and sporadic contacts with plaintiff.  The ALJ did not address the issue, and for the reasons stated in the text neither must I.

24

**D.      Dr. Cottone**

Next, plaintiff argues that the ALJ failed to properly consider the report of the psychological consultant, Dr. Cottone.  SSR 96-6p requires ALJs to consider the reports of state agency consultants about the nature and severity of the claimant's impairments.  While ALJs are not bound by such reports, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  SSR 96-6p.

Plaintiff notes that Dr. Cottone found that he was markedly limited in his ability to understand, remember and carry out detailed instructions, and moderately limited in several other areas.  (Tr. at 58-59.)  Plaintiff contends that this is contrary to the ALJ's assertion that no doctor found any long-term, significant mental restriction on his functional capacity.

Although the ALJ did not specifically refer to Dr. Cottone's report, he did find that plaintiff could understand, remember and carry out simple instructions, make simple work-related decisions, and respond appropriately to supervision, co-workers and usual work situations.  (Tr. at 16.)  This is virtually identical to the RFC contained in section III. of Dr. Cottone's report.  (Tr. at 60.)  The ALJ also concluded that plaintiff had a pain disorder (Tr. at 16), as Dr. Cottone found (Tr. at 62).  Further, Dr. Cottone noted that plaintiff's symptoms were "mild to moderate without [treatment]" and that his "credibility is questionable."  (Tr. at 74.)  The ALJ made similar findings.  (Tr. at 13, 14-16.)  Finally, plaintiff does not point to any material inconsistencies between Dr. Cottone's report and the ALJ's decision.  Therefore, although the ALJ should have explicitly referred to Dr. Cottone's report, the error was harmless.

The case upon which plaintiff relies is distinguishable.  In <u>Windus v. Barnhart</u>, 345 F. Supp. 2d 928, 942-43 (E.D. Wis. 2004), I specifically noted that the ALJ's failure to consider

25

the consultants' opinions was not harmless, for the VE in that case had testified that if those opinions were accepted the claimant could not work. Because there is no indication in the present case that the ALJ's decision would have been any different had he explicitly considered Dr. Cottone's opinion, there was no reversible error.[17]

## E.    Speculation

Next, plaintiff argues that the ALJ improperly relied on his own speculation in finding plaintiff's claims not credible. The court must defer to the ALJ's evaluation of the claimant's credibility because he had the opportunity to personally observe the claimant's demeanor at the hearing. Windus, 345 F. Supp. 2d at 945. Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994). Further, the ALJ must comply with SSR 96-7p in evaluating credibility. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). SSR 96-7p provides that in evaluating symptoms such as pain the ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p. If so, the ALJ must evaluate the effects of the claimant's symptoms to determine the extent to which

---

[17]Plaintiff contends that Dr. Cottone's evaluation was unreliable because he did not have access to the records from the psychiatric hospital relating to his in-patient stay. However, plaintiff has not explained how this is so or argued that the record was not fully developed without these records.

26

they limit his ability to work, SSR 96-7p, and "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3).

Plaintiff argues that the ALJ erred in various respects in considering the credibility of his claims. However, in so arguing he fails to recognize that the ALJ did not rely on any single factor in finding plaintiff's claims incredible. Rather, the ALJ relied on the entire record, including (1) the observations by the examining consultants that plaintiff exaggerated his symptoms, put forth a poor effort on testing, failed to give a straight answers to questions, and claimed depression and pain well in excess of his presentation and the relatively normal examination findings (Tr. at 12, 13); (2) the diagnosis of only a back strain and finding of negative straight leg raising by Dr. Venkatesan, which were inconsistent with an inability to perform even light work (Tr. at 13); (3) plaintiff's irregular treatment and inconsistent use of medication (Tr. at 14, 15); (4) his use of a cane in the right hand during one consultatative examination (despite a left-sided limp) contrasted to his "normal gait" during a second examination the same day, as well as his inconsistent claim of severe hand cramps that precluded daily activities such as making a bed (Tr. at 15); (5) the fact that his symptoms could be controlled by medication (Tr. at 15); (6) the lack of significant limitations from a treating physician (Tr. at 15); (7) his status as a convicted felon (Tr. at 15); and (8)

27

his poor and inconsistent earnings (Tr. at 16).  This was a case, like <u>Butera v. Apfel</u>, 173 F.3d 1049, 1055 (7th Cir. 1999), where plaintiff's claim of disability was in large part dependent on the credibility of his subjective description of his symptoms.  And the ALJ found that plaintiff's credibility was poor.  The ALJ fully explained the basis for his findings, and the factors he relied upon were proper under SSR 96-7p and § 404.1529.  <u>See, e.g.</u>, <u>Sienkiewicz v. Barnhart</u>, 409 F.3d 798, 816-17 (7th Cir. 2005) (affirming ALJ's rejection of claimant's complaints of extreme pain, which were inconsistent with the medical findings of only minimal or moderate limitations, her routine and conservative treatment, and her failure seek medical treatment for certain conditions); <u>Luna</u>, 22 F.3d at 691 (affirming finding that the claimant's complaints of pain were inconsistent with his minimal reliance on pain medication); <u>Mayberry v. Massanari</u>, No. C 00-3847, 2001 U.S. Dist. LEXIS 16093, at *12-14 (N.D. Cal. Sept. 28, 2001) (affirming credibility determination based on claimant's poor effort and inconsistent behavior during examinations, failure to refill prescribed pain medication, and poor work history); <u>Eiting v. Apfel</u>, 44 F. Supp. 2d 1008, 1019-21 (E.D. Mo. 1999), <u>aff'd</u>, 208 F.3d 217 (8th Cir. 2000) (affirming where ALJ found, <u>inter alia</u>, that the objective medical evidence did not support claimant's subjective complaints, that claimant had a poor prior work record, that she was "motivated to qualify for disability benefits," that there were inconsistencies between claimant's testimony and the medical records (including one record noting that claimant walked with a limp while another described her gait as normal), and that the claimant took no strong medication for her pain).

     None of plaintiff's specific complaints convince me that the ALJ erred.  First, he notes that the ALJ may not draw a negative inference based on lack of treatment without considering any explanations, such as lack of funds.  <u>See</u> SSR 96-7p; <u>see also</u> SSR 82-59.

28

However, the ALJ specifically addressed – and rejected – this possibility, noting that plaintiff had adequate access to health care resources. (Tr. at 14.) Further, plaintiff was represented by counsel at the hearing, and he made no effort to show that the sporadic treatment was based on any excusable reason. Nor does plaintiff offer any persuasive reason for the minimal treatment before this court. Finally, the ALJ did not deny the claim based solely on plaintiff's failure to comply with treatment; rather, he noted this as a factor in his credibility analysis, which SSR 96-7p permits.[18] (Tr. at 15-16.) Plaintiff's reliance on SSR 82-59, which applies when the claimant is rendered disabled based on his failure to follow treatment that would restore his ability to work, is misplaced. The ALJ found that plaintiff's symptoms were not disabling, with or without treatment, a finding supported by substantial evidence.

Second, plaintiff contends that there is no medical support for the ALJ's conclusion that his symptoms were controllable with medication. However, plaintiff told Dr. Venkatesan that Motrin reduced his pain to 3/10 (Tr. at 164), and that after he stopped taking his psychiatric medication he felt his depression returning (Tr. at 163). See Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) ("Donahue's own estimate is that his pain reaches a level of 3 on a scale of 0 to 10, and this does not sound disabling.").

_____

[18]Plaintiff's reliance on Brown v. Barnhart, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) is misplaced. In that case, I reversed an ALJ's credibility determination in part because the ALJ's finding that plaintiff failed to obtain treatment was unsupported by medical evidence as to what sort of treatment the claimant should have pursued and because the ALJ failed to consider why the claimant was not receiving treatment. In the present case, the ALJ considered whether plaintiff's financial situation precluded treatment (Tr. at 14), and the record contains evidence of the treatment regime prescribed by the doctors (see, e.g.,Tr. at 162-64).

Third, he argues that there was no medical support for the ALJ's finding that plaintiff's testimony of severe hand cramps was inconsistent with his use of a cane. This seemed a common sense observation, rather than a medical judgment. Further, as the ALJ noted, there was no medical evidence of hand problems (Tr. at 14), and Dr. Cason found that plaintiff had good grip strength bilaterally (Tr. at 12). In any event, this was just one small part of the ALJ's credibility determination, and any impermissible medical finding by the ALJ was at most harmless error. Likewise, I can find no reversible error in the ALJ's noting of Dr. Venkatesan's findings of negative straight leg raising and back strain. The ALJ was permitted to consider the relatively normal physical examination findings in assessing credibility and RFC. See 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."). Plaintiff questions the ALJ's linking of the negative straight leg raising test to the finding of a light RFC. (Tr. at 13.) However, the ALJ relied on more than just this test in setting RFC. (Tr. at 14-16.)

Fourth, plaintiff argues that the ALJ impermissibly speculated about the duration of his symptoms based on Dr. Krawczyk's report, which did not mention the 12-month duration issue. However, what the ALJ drew from Dr. Krawczyk's report was that plaintiff's symptoms were only moderate even when he was not taking his medication. (Tr. at 13; 167-68.) This was consistent with Dr. Johns's finding that plaintiff's symptoms were "mild to moderate without treatment." (Tr. at 128.) It was reasonable for the ALJ to note that plaintiff's symptoms would not be even moderate for a 12-month period if he took his medication.

30

Finally, plaintiff attacks the ALJ's characterization of him as "benefit motivated." (Tr. at 14.) He notes that all claimants are motivated to get benefits, which is why they go through the process. However, what the ALJ found here was that plaintiff was exaggerating his symptoms in order to get benefits, a finding supported by substantial evidence in the record. See Eiting, 44 F. Supp. 2d at 1020 (citing Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir. 1992)) ("The ALJ found that this suggests that Plaintiff is motivated to qualify for disability benefits, thus lessening the credibility of her allegations. An ALJ may discount a claimant's subjective complaints for, among other reasons, that she appears to be motivated to qualify for disability benefits."). The ALJ did not stand the credibility process on its head in making this observation, as plaintiff alleges, rather this finding flowed from the many others discussed above.

Therefore, for all of these reasons, I find that the ALJ's decision was not based on impermissible speculation, and that his credibility determination was supported by substantial evidence in the record and was not patently wrong.

## F.    Somatoform Disorder

Plaintiff next alleges that the ALJ failed to consider the impact of his somatoform disorder. Somatoform disorder is "a fancy name for psychosomatic illness, that is, physical distress of psychological origin." Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004). Evaluating the effects of pain on a claimant who suffers from such a disorder is difficult.

> Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second. The cases involving somatization recognize this distinction.

31

Id.

Plaintiff argues that the ALJ did not address the fact that he suffers from a psychological pain disorder, instead finding that the inconsistencies in the record were evidence of incredibility. Dr. Cottone checked "somatoform disorder" on the form report he completed (Tr. at 62), later explaining that plaintiff had a "pain disorder" (Tr. at 68). As discussed above, the ALJ failed to specifically mention Dr. Cottone, but his decision was consistent with Cottone's report. As is pertinent to this issue, the ALJ found that plaintiff had a pain disorder. (Tr. at 16 #3.) Further, there is no evidence in the record supporting greater limitations based on this disorder. Dr. Cottone found only mild to moderate restrictions. (Tr. at 72.) He also noted that plaintiff "tended to exaggerate symptoms." (Tr. at 74.) Finally, plaintiff fails to explain how the presence of a somatoform disorder would cause him to jump when a physician merely touched the skin of his back or any of his joints (Tr. at 125-26), how it would cause him to limp during a physical examination yet have a normal gait during a psychological exam later that date (Tr. at 125, 130), or how such a disorder would explain his minimal treatment.[19] Indeed, the primary reason the Seventh

_____

[19]Plaintiff argues that no doctor resolved the issue of whether his "jumping" and inconsistent limping were affected by his somatoform disorder. However, Dr. Cottone noted that plaintiff's credibility was questionable and that he tended to exaggerate. (Tr. at 74.) This was consistent with the opinions of the physical and psychological consultants. Plaintiff also argues that the lack of medical findings, such as straight leg raising, is not definitive because of the psychological factors affecting his pain. However, as discussed above, the ALJ relied on many factors in finding plaintiff not credible. Carradine did not hold that the ALJ must accept the allegations of disabling pain from a claimant who suffers from a somatoform disorder; rather, it held, consistent with previous decisions, that such allegations cannot be rejected just because they are unsupported by objective findings. See Rucker v. Chater, 92 F.3d 492, 496 (7th Cir. 1996) ("[W]e cannot discredit a complaint of pain simply because a plaintiff did not introduce objective medical evidence to support the extent of the pain, but neither are we required to give full credit to every statement of pain, and require a finding of disabled every time a

32

Circuit reversed in Carradine was the ALJ's failure in that case to reconcile the extreme pain-treatment procedures the claimant was willing to endure, including "not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator," with the limited physical findings. Id. at 755. The ALJ in Carradine got hung up on the absence of physical explanations for the claimant's pain, and unreasonably found that she was willing to endure extraordinary treatment "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits." Id. In the present case, conversely, plaintiff underwent little treatment, and his pain was largely controlled with over the counter medications. Therefore, the ALJ did not err in this regard.

## G.  Listings and RFC

Finally, plaintiff argues that the ALJ's RFC and step three determinations were not supported by substantial evidence and were contrary to the applicable legal standards. However, he fails to develop the argument, simply relying on his previous complaints about the ALJ's alleged speculation and ignorance of somatozation. To the extent that this argument differs from those addressed in the previous sections of this decision, I reject it based on lack of development. Weinstein v. Schwartz, 422 F.3d 476 (7th Cir. 2005) ("The failure to develop an argument constitutes a waiver.").[20]

---

claimant states that she feels unable to work.") (internal quote marks omitted).

[20]To the extent that plaintiff argues error at step three, I note that he has not set forth the Listing he allegedly meets, not does he cite any evidence supporting the argument. See Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005) (rejecting plaintiff's argument where she failed to specify which Listing she claimed to meet, or to set forth the supporting evidence). Dr. Cottone specifically found that plaintiff's pain disorder did not meet Listing 12.07. (Tr. at 68, 72.)

33

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

34